## The City of East St. Louis

*v.*

## The East St. Louis Gas Light and Coke Company.

*Filed at Mt. Vernon February 3, 1881—Rehearing denied May Term, 1881.*

1. Municipal corporations—*contracts ultra vires—extent of liability thereon.* Although there may be a defect of power in a corporation to make a contract, yet if a contract made by it is not in violation of its charter, or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise and in execution of the contract, to expend money and perform his part thereof, the corporation will be liable on the contract.

2. Same—*application of the rule—former decision.* This doctrine was applied in its full extent in the case of *Bradley* v. *Ballard*, 55 Ill. 413, though that being the case of a private corporation, it was there said there might be a

98  415
24a 547
26a 458
26a 460
26a 462

98  415
28a 502
28a 503
28a 506

98  415
128 456

98  415
31a 389

98  415
36a  58

98  415
140 453
141 549
142 533

98  415
42a 592

98  415
52a 580

98  415
47a 413

98  415
176 411
78a 551

98  415
178 313
178 319

98  415
83a  91

98  415
100a 413

Syllabus.

difference with respect to municipal corporations, and that their debts illegally contracted by their officers would not be binding upon tax-payers.

3. However, where the contract of a municipal corporation has no element of illegality, the objection made to it only alleging a defect of power in respect to the term of its duration, the doctrine that where a corporation has received benefits under a contract which is merely *ultra vires*, it shall pay for those benefits, should apply to the municipal corporation with equal force as in any case of a private corporation.

4. SAME—*of a contract by the city of East St. Louis to light its streets with gas.* The city of East St. Louis entered into a contract with a private corporation which was organized for the purpose of the manufacture of gas, for the lighting of the streets of the city for a period of thirty years. In pursuance of the terms of the contract, the gas company extended its main pipes and erected lamp-posts from time to time, as provided by ordinances of the city, and for several years, without objection on the part of the city, furnished gas for the lighting of the streets. In a suit by the gas company against the city to recover for gas previously furnished under the contract, it was objected on the part of the city that the contract was *ultra vires*,—that its term of duration was such as to operate as an improper abridgment of the legislative or governmental power of the city over the subject, and therefore the contract was not binding on the city, and there could. be no recovery. Without determining whether the contract could be upheld in that respect, it was *held,* that as the objection did not question the legality of the contract, but only alleged a defect of power as to the period of its duration, it would apply only to the *executory* part of the contract, not to that part which had been *executed.* So the city was liable for the gas which had been furnished to it prior to the bringing of the suit.

5. SAME—*of the power to contract generally.* By its charter, the city of East St. Louis was given power to contract and to be contracted with, to sue and to be sued, etc. It was also given power to provide for lighting the streets of the city;—and to make all ordinances necessary to carry into effect the powers vested by the charter in the city. A private corporation created by the legislature of this State, was also given power to contract and be contracted with, and to manufacture and sell gas for lighting the streets of the city of East St. Louis, and was given the exclusive privilege of supplying the city with gas for a period of thirty years. It was *held,* not only had the city the general power to make a contract in the execution of the authority given it to provide for lighting its streets, but the contracting with this particular private corporation was given sufficient sanction by the express provisions of its charter on that subject.

6. SAME—*constitutional limitation as to creating indebtedness.* Where a city entered into a contract for lighting its streets for a term of thirty years, the agreed price therefor to be paid monthly, which sum for any one year was not

in excess of the limitation in sec. 12, of art. 9, of the constitution, but, taken for the whole term, was in excess of the debt it was authorized to incur, it was *held*, that the contract was not prohibited by the constitutional provision, but was legal and binding, there being created no present indebtedness for the whole sum, but only as the gas should be supplied from month to month.

APPEAL from the Appellate Court for the Fourth District;—the Hon. TAZEWELL B. TANNER, presiding Justice, and the Hon. JAMES C. ALLEN, and Hon. DAVID J. BAKER, Justices;—heard in that court on appeal from the Circuit Court of St. Clair county, the Hon. WILLIAM H. SNYDER, Judge, presiding.

Mr. M. MILLARD, and Mr. J. M. FREELS, for the appellant:

The only authority of the city to provide for the erection of lamp-posts and lighting the streets is found in art. 3, sec. 5, paragraph 6, vol. 1, Priv. Laws 1869, p. 889.

The power conferred is one of a public and continuing nature, and must be exercised by ordinance, and not by contract. The contract in question is not authorized by any provision of the charter, and is in conflict with its general purpose and policy, and illegally suspends the operation of the legislative and other powers of the common council for the period of ten years, and is contrary to public policy. 25 Conn. 20, 39, 40; 12 Abb. Rep. 360, 378; *Presbyterian Church* v. *City of New York*, 5 Cowen, 538; *Coates* v. *Mayor, etc. of New York*, 7 id. 585; *Milhau* v. *Sharp*, 17 Barb. 435; *Milhau* v. *Sharp* (in Court of Appeals), 27 N. Y. 611; *State* v. *Cincinnati Gas Co.* 18 Ohio St. 262; Dillon on Mun. Corp. secs. 371, 372; *Gale* v. *The Village of Kalamazoo*, 23 Mich. 344; *Butler* v. *Mayor of New York*, 31 How. Prac. Rep. 251; *Mayor and Aldermen of the City of Jackson* v. *Bowman*, 39 Miss. 671; *Gozzler* v. *Corporation of Georgetown*, 6 Wheat. 593; *East Hartford* v. *Hartford Bridge Co.* 10 How. 535; *Davis* v. *Mayor of New York*, 14 N. Y. 506; *Richmond County Gas Light Co.* v. *Middletown*, 59 N. Y. 228; 1 Dillon on Corp. secs. 253, 254, 256, 257, 259, 296; *Thompson*

27—98 ILL.

v. *Schemmerhorn*, 6 N. Y. 92; *State ex rel.* v. *Cincinnati Gas Light Co.* 18 Ohio St. 290; *Illinois and St. Louis Railroad and Canal Co.* v. *City of St. Louis*, 2 Dill. Circuit Court Rep. 71; *Harlem Gas Co.* v. *Mayor of New York*, 33 N. Y. 307; *Bradley* v. *Mayor*, 20 id. 312.

A city can not be held liable for a contract made by the municipal officers in violation of law. *Fox* v. *New Orleans*, 12 La. Ann. Rep. 154.

Contracts to violate the charter or to bargain away or restrict the free exercise of legislative discretion vested in the municipality or its officers, in reference to public trusts, are void. See *action against Bowman*, 35 Miss. 671; 1 Dillon on Mun. Corp. sec. 372; *Munsell* v. *Temple*, 3 Gilm. 93.

The principle is well settled, that the powers conferred upon a municipal corporation constitute a trust to be exercised for the public good, and can not be delegated, embarrassed, bartered away, or impaired by contract. Dillon on Mun. Corp. sec. 64; Cooley's Const. Lim. 206; *State* v. *Mayor of New York*, 3 Duer, 131.

It will be seen from the foregoing authorities, that the principle, that the officers of a municipal government can not bind their successors by any acts which tend to limit the exercise of the powers conferred by the charter of the corporation, has been applied to the following powers, analogous in their character to the one in question:

The power to control and regulate the public streets—*Davis* v. *The Mayor of New York*, 14 N. Y. 506; *Milhau* v. *Sharp*, 27 id. 611; *The State* v. *The Cincinnati Gas Light and Coke Co.* 18 Ohio St. 262. The power to regulate the grading and leveling of the streets—*Gozzler* v. *Georgetown*, 6 Wheat. 593; *Reynolds* v. *Shreveport*, 13 La. Ann. Rep. 426. The power to provide for the cleaning and sweeping of public streets—*Britton* v. *The Mayor of New York*, 21 How. Prac. 251. The power to provide for and regulate public markets—*Gale* v. *Kalamazoo*, 23 Mich. 344. The power to regulate and control the public wharves—*Illinois, etc. Canal Co.* v. *St.*

*Louis,* 2 Dill. Circuit Court Rep. 70.   A power identical with the one in question, namely, the power to cause the public streets to be lighted—*Richmond County Gas Light Co.* v. *Middletown,* 59 N. Y. 228.

A municipal corporation may successfully interpose the plea of *ultra vires,*—that is, set up as a defence its own want of power, under its charter or constituent statute, to enter into a given contract, or to do a given act in violation or excess of its corporate power and authority.   The cases asserting these principles are numerous and uniform.   Some of the more important and striking ones only need be cited. *Mayor of Albany* v. *Cunliff,* (city not liable for negligently building bridge, under an unconstitutional statute,) 2 Comst. (N. Y.) 165 (1849); reversing same case, 2 Barb. 190; *Cuyler* v. *Trustees of Rochester* (laying out street contrary to charter), 12 Wend. 165 (1834); *Hodges* v. *Buffalo* (4th July appropriation), 2 Denio, 110 (1846); *Halstead* v. *The Mayor,* 3 Comst. 430 (1850); *Martin* v. *The Mayor,* 1 Hill, 545; *Boone* v. *Utica,* 2 Barb. 104; *Cornell* v. *Guilford,* 1 Denio, 510; *Boyland* v. *The Mayor and Aldermen of New York,* 1 Sandf. (N. Y.) 27 (1847); *Dill* v. *Wareham,* 7 Metc. 438 (1844); *Vincent* v. *Nantucket,* 12 Cush. 103 (1858), per Merrick, J.; *Stetson* v. *Kempton,* 13 Mass. 272; *Parsons* v. *Inhabitants of Goshen,* 11 Pick. 396; *Wood* v. *Inhabitants of Lynn,* 1 Allen (Mass.), 108 (1861); *Spalding* v. *Lowell,* 23 Pick. 71; *Mitchell* v. *Rockland,* 45 Me. 496 (1858); same case, 41 id. 363; *Anthony* v. *Adams,* 1 Metc. (Mass.) 284 (1840); *Western College* v. *Cleveland,* 12 Ohio, 375 (1861); *Commissioners* v. *Cox,* 6 Ind. 403 (1855); *The Inhabitants* v. *Weir,* 9 id. 224 (1857); *Smead* v. *The Indianapolis, Pittsburgh and Cleveland Railroad Co.* 11 id. 104 (1858); *Brady* v. *The Mayor,* 20 N. Y. (6 Smith) 312; *Appleby* v. *The Mayor, etc.* 15 How. Prac. 428; *Estep* v. *Keokuk Co.* 18 Iowa, 199, and cases cited by Cole, J.; *Clark* v. *Polk County,* 19 Iowa, 248; *Clark* v. *City of DesMoines,* 6 Am. Law Register, 149.

Appellee claims that an interest bearing indebtedness is what the constitution was intended to prohibit; but that is not the doctrine of this court, as is well known. *Springfield* v. *Edwards*, 84 Ill. 626; *Law* v. *People, etc.* 87 id. 385; *New Orleans* v. *Clark*, 95 U. S. 652.

Mr. R. A. Halbert, Mr. John B. Bowman, and Mr. C. F. Nœtling, for the appellee:

As to the general powers of municipal corporations to make contracts to carry out the powers expressly conferred, counsel cited many authorities, among which are Cooley Const. Lim. 205; Dillon on Mun. Corp. secs. 371, 372; *Douglas* v. *Virginia City*, 5 Nev. 147; *Tucker* v. *Virginia City*, 4 id. 207; *Reynold* v. *Com'rs of Stark Co.* 5 Ohio, 204; *Allen* v. *Cerro Gordo Co.* 34 Iowa, 54; *City of Galena* v. *Corwith*, 48 Ill. 423; *People* v. *Hurlbut*, 24 Mich. 103; *Board of Park Com.* v. *Detroit*, 28 Mich. 237; *Bailey* v. *New York*, 3 Hill, 531; *Small* v. *Danville*, 51 Me. 361; *Philadelphia* v. *Fox*, 64 Penn. St. 180; *Western College* v. *Cleveland*, 12 Ohio N. S. 375; *Western Saving Fund Society* v. *Philadelphia*, 31 Penn. sec. 183; *San Francisco Gas Co.* v. *San Francisco*, 9 Cal. 453; *Oliver* v. *Worcester*, 102 Mass. 499; Dillon on Mun. Corp. sec. 39; *Moodalay* v. *East India Co.* 1 Brown's Ch. R. 469; *State* v. *Tappan*, 29 Wis. 664; *Atkins* v. *Randolph*, 31 Vt. 226; *People* v. *Mayor of Chicago*, 51 Ill. 30; *De Voss* v. *Richmond*, 18 Gratt. 338; *Lloyd* v. *Mayor of New York*, 5 N. Y. (1 Seld.) 374; *Touchard* v. *Touchard*, 5 Cal. 306; *Rochester White Lead Co.* v. *City of Rochester*, 3 N. Y. 466; *Bailey* v. *New York*, 3 Hill, 531; *Wheeler* v. *City of Philadelphia*, 77 Penn. St. 374.

It is contended that the power to provide for lighting the streets is a governmental power, because it is required to be exercised by ordinance. The usual mode by which cities may contract, is by ordinance. Dillon on Mun. Corp. secs. 373, 374; *People* v. *San Francisco*, 27 Cal. 655. And when the charter points out the mode, it must be pursued in making

contracts, and when thus made it can be changed only by a vote of the council. *Terre Haute* v. *Lake*, 43 Ind. 430; *Indianapolis* v. *Bly*, 39 id. 373.

Where a city contracts in its corporate capacity through its officers, acting by authority of an ordinance of the common council, the city is not at liberty to annul the contract so made by an ordinance repealing the one authorizing the contract. Having made the law the city is bound by it. *State* v. *Heath*, 20 La. Ann. 1721.

. It has no more rights in that respect than an individual. *Hewitt* v. *Town of Alton*, 7 N. H. 257; *Western Saving Society* v. *Philadelphia*, 31 Pa. St. 175; *Prather* v. *New Orleans*, 24 La. Ann. 41; *Davenport Gas Co.* v. *Davenport*, 13 Iowa, 233.

The right to borrow money does not nullify the power of a corporation to pay its debts, or provide for their payment at a future day. This power is a vital one. *Mills* v. *Gleason*, 11 Miss. 470; *Dean* v. *City of Madison*, 7 Wis. 688; *Williamsport* v. *Commonwealth*, 84 Pa. St. 487; *Bank* v. *Chillicothe*, 7 Ohio, 221; *Clark* v. *School District*, 3 R. I. 197; *Sheffield* v. *Andress*, 56 Ind. 157; *Tucker* v. *Raleigh*, 75 N. C. 367; *Douglas* v. *Virginia City*, 5 Nev. 147; *Sturtevant* v. *Alton*, 3 McLean, 393; *Lexington* v. *Butler*, 14 Wall. 282.

As to the power of a city to create a debt, payable in the future, to carry out a given power, counsel cited *Gale* v. *City of Kalamazoo*, 23 Mich. 344; *Ketchum* v. *City of Buffalo*, 14 N. Y. 351; *Grant* v. *Davenport*, 36 Iowa, 396; *Swartz* v. *Flatboats*, 14 La. Ann. 244; *Brown* v. *Duplessis*, 14 id. 842.

The constitutional provision does not apply to such a case as this. There was no debt except at the end of each month. At the time the city made this contract, it might lawfully have incurred an indebtedness of $20,000. On the ground assumed by the appellant, that a debt of over $300,000 was incurred by making the contract, twenty thousand of the debt would have been valid. It would only have been void in so far as it was in excess of the power to contract a debt.

*McPherson* v. *Foster*, 43 Iowa, 48.  See, also, *Wiley* v. *Silliman*, 62 Ill. 170; *Marshall* v. *Silliman*, 61 id. 218; *Grant* v. *City of Davenport*, 36 Iowa, 401; *Dively* v. *Cedar Rapids*, 27 id. 227.

If a contract made by a corporation is not in violation of the charter of the corporation or some statute prohibiting it, and the corporation has by its acts induced a party, relying upon such promise and in execution of the contract, to expend money and perform his part of the contract, the corporation is liable on the contract.  *State Board of Agriculture* v. *Citizens' Street Ry. Co.* 47 Ind. 427.  See, also, *Bridge Co.* v. *Frankfort*, 18 B. Monroe, 41; *San Francisco Gas Co.* v. *San Francisco*, 9 Cal. 453; *Argentine* v. *San Francisco*, 16 id. 655.

The rule as to executed contracts *ultra vires* is, that by the plainest rules of good faith they should generally be allowed to stand.  2 Kent, (11th ed.) 1 p. 331—note; *Parrish* v. *Wheeler*, 22 N. Y. 258; *Argentine* v. *San Francisco*, *supra*.

A municipal corporation having received benefits at the expense of the contracting party, it can not object that it was not empowered to perform what it promised in return, in the mode in which it promised to perform.  *Hitchcock* v. *Galveston*, 6 Otto, 349.

Although there may be a defect of power in a corporation to make a contract, yet if a contract made by it is not in violation of its charter or of any statute prohibiting it, and the corporation has by its promise induced a party, relying on the promise in executing the contract, to expend money and perform his part thereof, the corporation is liable on the contract.  *State Board of Agriculture* v. *City Street Ry. Co.* 47 Ind. 407.

Mr. Justice Sheldon delivered the opinion of the Court:

This was an action brought by the East St. Louis Gas Light and Coke Company against the city of East St. Louis, for money claimed to be due under a contract entered into between the parties on the 3d day of October, 1874, in pur-

suance of an ordinance of the city council directing it, by which the gas light company agreed to extend its street main pipes within the present and future limits of the city, whenever and wherever the city should order public lamps to be erected, upon connecting lines, not less than one lamp for every 125 feet of street main, and that the company should erect lamp-posts and furnish gas for the sum of $35.20 per lamp per year, to be paid in monthly installments, upon bills therefor rendered by the company.  Two hundred lamps were to be furnished at once along the then present main pipes of the company, which were accordingly furnished, and were first lighted in November and December, 1874, and have been kept lighted ever since.  On November 10 and December 17, 1875, ordinances were passed by the city council requiring severally the erection of additional public lamps, and the extension accordingly of the company's street main pipes; and in pursuance thereof the company extended its street main pipes along the streets named in these ordinances, over a distance of 13,500 feet,—more than two and one-half miles,—and erected thereupon 103 street lamp-posts and lamps in addition, and lighted these in January and February, 1875, and ever since.  The contract was to continue for the term of thirty years, from October 1, 1874.  This suit was brought for the street light furnished in pursuance of the contract for the months of March, April, May, June, July and August, 1877, amounting to $5,440.56.

The declaration contains a special count upon the contract, and the common counts.  The company recovered in the circuit court the contract price,—the sum sued for.  On appeal to the Appellate Court for the Fourth District the judgment was affirmed, and the city appealed further to this court.

The defence is placed solely upon the ground that the city had no power to make the contract.

By its charter (vol. 1, p. 885, Private Laws 1869,) the city of East St. Louis is given power to contract and to be con-

tracted with, to sue and be sued, etc. It is further provided therein, that the city council shall have power, by ordinance, to establish hospitals, etc.; to provide the city with water, etc.; to provide for lighting the streets of the city, and erecting lamp-posts; to provide for the erection of all needful buildings for the city, etc.; to establish a work house or houses of correction; to make, pass, publish, amend and repeal all ordinances, rules and sanitary regulations that may be necessary to carry into effect the powers vested by the charter in the city.

The charter of this East St. Louis Gas Light and Coke Company is in evidence, found in vol. 1, pp. 584, 585, Private Laws 1865, creating it a body corporate, with power to contract and be contracted with, and giving it power and authority to manufacture and sell gas and coke, and to be used for the purpose of lighting the town of East St. Louis and the territory between its boundary and the Mississippi river, in St. Clair county, Illinois, or the *streets*, etc., therein.

Section 4 is: "Said company shall have the exclusive privilege of supplying the said town of East St. Louis and said additional territory and the inhabitants thereof with gas, for the purpose of affording light, for thirty years, provided the rate of their charges for gas furnished shall not exceed the rate charged for gas by the Belleville Gas Light and Coke Company, and ten per cent in addition to said last rate."

It will thus be seen that the city is given power to contract and be contracted with, and this must extend to the purposes of its incorporation. Among such purposes are the ones above enumerated—to establish hospitals, to provide the city with water, to provide for lighting the streets and erecting lamp-posts, to provide for the erection of needful buildings, to establish a work house or houses of correction.

How are these various objects to be accomplished, except through the means of contract? The mere ordaining with respect to them will not secure them. When the city has

once determined upon the execution of any one of these provisions, then contract becomes necessary for carrying into
effect the determination, as, for the purchase of ground, the
erection of buildings, the obtaining of the supply of water or
street light.

After having acted under the power "to provide for lighting the streets and erecting lamp-posts," by determining to
light the streets with gas, and what streets shall be lighted,
it is for the city to decide how it shall provide the material
for lighting,—whether by the erection of its own gas works,
etc., and the manufacture of its own gas, or contracting with
others for its supply; but whichever the mode adopted, it is
only through the means of contract that it can be carried out.

But for the city's contracting with this company upon the
subject, sufficient sanction is found in the charter of the company, one of the very purposes of whose creation, as expressed
in its charter, is to manufacture and sell gas for lighting the
streets of the town of East St. Louis, and the company is
given the exclusive privilege of supplying the town of East
St. Louis with gas, for the purpose of affording light, for
thirty years, the maximum charge therefor being fixed by
the charter. Here is surely an expression of the design and
purpose of the legislature that the town of East St. Louis
might contract with this company for the supply of gas for
lighting its streets. The town of East St. Louis is identical
with the city of East St. Louis, it having been re-organized
as a city in April, 1865, and re-chartered under its present
charter of March 26, 1869.

But the particular objection which is taken to this contract,
as it has been made, is its term of duration,—for thirty years.
In this respect it is insisted the contract is an abridgement
of the legislative or governmental power of the city, in that
it barters away the power of the legislative body of the city
to legislate on the subject for thirty years.

The doctrine, as declared in 1 Dillon on Mun. Corp.
§ 61, is referred to, viz: "Powers are conferred upon muni-

cipal corporations for public purposes, and as their legislative powers can not, as we have just seen, be delegated, so they can not be bargained or bartered away. Such corporations may make authorized contracts, but they have no power as a party to make contracts or pass by-laws which shall cede away, control or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties." It is contended that under this doctrine the contract stands condemned, and is void.

At first blush the contract may seem objectionable, as unnecessarily tying up the hands of the city council for such a length of time, though some excuse therefor may be found in the presumed difficulty of securing a contract for the construction of such expensive works as are here involved, without the assurance of patronage for some considerable length of time, and in the mention in the company's charter of thirty years as the time for the exclusive supply of the city with gas light.

Whether this length of time of the running of the contract be a valid objection to it, we deem it unnecessary to determine for the purpose of this suit, and would not be understood as expressing any opinion in that regard, for, admitting that the contract can not be upheld in this respect, it is an objection, we conceive, which applies only to the *executory* part of the contract, and has no application to the *executed* part of it. It does not appear in the case, nor is it claimed, that the city has exercised its power, by ordinance or otherwise, or manifested its wish, to provide differently, than as by the contract, for the lighting of its streets. So far as the contract has been executed, it has been as one for the furnishing of the light during the pleasure of the city. Had the contract been in that form, it would not have been obnoxious to the objection made to it. Courts should not destroy the contracts made by parties further than some good reason requires. Such an objection as is made to this contract, that it interferes with the exercise of the legislative or

governmental power of the city over the subject, does not require that the contract should be held void, but only voidable so far as it is executory. It is enough for the obviating of any such objection, that there be the right at any time to avoid the contract, so that there may be the freedom to exercise its governmental power in regard to the subject, when and as the city pleases. So far as the contract has been performed, by furnishing light to the city without its disaffirmance of the contract, it may be treated as if it had been a single contract for the furnishing of the light for the months in question alone, and one fully completed. The gas light having been furnished and enjoyed by the city without objection, it should pay for it. There was no interference with the exercise of any legislative or governmental power upon the subject. As well after the erection of a hospital or work house, or other needful building, or gas works for itself, under a contract for such erection or construction, had one been made, might the city refuse to pay therefor, because the contract, during the time of its running, was an abridgement of the city's governmental power to provide otherwise in respect to the subject matter, as to refuse to make payment in the present case for the gas light which has been furnished. We do not see why there would not be as much force in the objection which is here made, in the one case as in the other.

There can be no doubt that it was within the scope of the authority of the city to contract upon the subject. There is nothing of illegality in the contract, such as requires that it should be held void in the whole—the part performed as well as that not performed; and what the city has received and enjoyed the benefit of, under the contract, there is no principle of law which will justify it in its refusal to pay for.

The general rule applying in such case is thus stated in 2 Parsons on Contracts, 790: "A general rule has been asserted, which certainly rests upon reason and justice. It is, that where a party has accepted and made his own the

benefit of a contract, he has estopped himself from denying in the courts the validity of the instrument by which those benefits came to him."

In Field on Corporations, sec. 273, ¶ 8, the following is deduced as the conclusion from an extended examination of the authorities upon this subject: " The better doctrine would seem to be, that where a contract *ultra vires* has been made by a corporation, and it has received the full consideration, and appropriated the same so that it can not be restored and the other party placed *in statu quo,* and especially where no objection is interposed upon the part of those who might have made it, the corporation will generally be bound by the contract, the same as a natural person."

In *Hitchcock* v. *Galveston,* 96 U. S. 341, the city council of Galveston had contracted with Hitchcock and others for the construction of certain sidewalks, to be paid for by the issue of city bonds. After the work was partly performed, the city council stopped the work and prevented its completion. The action was for this breach of the contract. It was objected that by reason of the supposed want of power to issue the bonds, the entire contract was void, and no action could be maintained for the breach thereof. The Supreme Court of the United States held that the city was liable to the extent of the work actually performed under the contract, even though it had no lawful authority to issue the bonds, and in discussing the subject said: " It is enough for them (plaintiffs) that the city council have power to enter into a contract for the improvement of the sidewalks; that such a contract was made with them; that under it they have proceeded to furnish materials and do work, as well as to assume liabilities; that the city has received and now enjoys the benefit of what they have done and furnished; that for these things the city promised to pay; and that after having received the benefit of the contract the city has broken it. It matters not that the promise was to pay in a manner not authorized by law. If payments can not be made in bonds

because their issue is *ultra vires,* it would be sanctioning rank injustice to hold that payment need not be made at all. Such is not the law. The contract between the parties is in force, so far as it is lawful." Citing as in support of the decision the case of the *State Board of Agriculture* v. *The Citizens' Street Railway Co.* 47 Ind. 407, where it was held, that "although there may be a defect of power in a corporation to make a contract, yet if a contract made by it is not in violation of its charter, or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise and in execution of the contract to expend money and perform his part thereof, the corporation is liable on the contract." See *Daniels* v. *Tearney,* 102 U. S. Rep. 415.

This doctrine was, by this court, recognized and applied in its full extent in the case of *Bradley* v. *Ballard,* 55 Ill. 413, though, that being the case of a private corporation, it was there said there might be a difference with respect to municipal corporations, and that their debts illegally contracted by their officers would not be binding upon tax-payers. But the present is no such case of a debt illegally contracted,— there is, at most, but a defect of power to make a contract running for so long a time, and we consider, in the circumstances of this case, that the doctrine above enunciated applies here with equal force as in any case of a private corporation.

It is insisted, further, that the city had no power to make the contract in question, because thereby an indebtedness was incurred in excess of the limitation fixed by section 12, art. 9, of the constitution of this State. The provision in this respect is, that no municipal corporation "shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebted-

ness. Any * * municipal corporation incurring any indebteduess as aforesaid, shall, before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same." It appears that the previous indebtedness of the city existing at the time this contract was made, was $20,000 short of this constitutional limit. Two hundred lamps—the minimum number provided for by the contract—at $35.20 per lamp per year, would amount to $7040 in a year, and to an aggregate for thirty years of $211,200.

Now, appellant's counsel contend that this aggregate sum of $211,200 should be considered as a present indebtedness,— as a debt incurred at the making of this contract on October 3, 1880.

We do not assent to the correctness of this view.

The contract was for the furnishing of an article for nightly consumption by the city during a period of thirty years, fixing the price at which the article should be furnished. There was no indebtedness in advance of anything being furnished, but indebtedness arose as gas should have been furnished along from night to night during the period of thirty years. The contract provides for the payment, monthly, at the end of each month, the amount that became due for the month then ended. When the company has furnished the gas for a certain month, then there is a liability—an indebtedness arises—and not before, as we conceive. Hence the amounts that might become due and payable under the contract in future years, did not constitute a debt against the city at the time of the entering into the contract, within the meaning of the constitution.

Had the contract been performed in compliance with its terms, as it should and presumptively would have been, there would have arisen no indebtedness on the part of the city for more than one month's supply of gas. As already observed,

this gas light was one of the ordinary current expenses of the city, it being furnished and consumed nightly, which would be and was presumably provided for and met by the annual appropriation and levy of taxes to pay the ordinary current expenses of the year, and from the city's other sources of revenue. We are clearly of opinion the contract does not fall within the constitutional inhibition.

It appears that on February 1, 1877, the city was indebted $50,000 in excess of the constitutional limit. This might have been, and yet the city, in the subsequent months, at the times the gas sued for was furnished, may not have been indebted beyond the constitutional limit; and this, without further noticing the point, we deem a sufficient answer to the objection made, that the city, at the times when the gas was furnished, was indebted beyond said limit. Such a defence in a case such as this, if it be one, must be strictly made out.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Dickey, Ch. J.: Although the extracts from Parsons and from Field, contained in the opinion of the court delivered by Mr. Justice Sheldon in this case, relate solely to the law in respect to private corporations, and although it is expressly declared by this court in *Bradley* v. *Ballard,* that "what we have said applies only to private corporations organized for gain," and that "municipal corporations stand upon a different ground," still it is plain that the principle (stated in Parsons and in Field, and applied by this court to a private corporation in *Bradley* v. *Ballard,*) must logically be equally applicable to a municipal corporation in all cases where *the act from which the estoppel arises,* and also *the act* for a failure to *perform which* the action is brought, *are both* within the acknowledged powers of such municipal corporation. In this case the estoppel arises from the act of the city in receiving the gas without objection, under the contract, in which the price *pro tanto* was specified. This act the city,

under its charter, had full power to perform. The act which the city became bound by its conduct to perform, was to pay for the gas received at the price agreed upon, and it is for a failure to perform this act this action is brought. The city had full power, under its charter, to pay for the gas received, and also power to fix the price by contract.

Separate opinion by Mr. Justice Walker:

I concur in the decision announced in this case, and shall present some of the views which lead me to that conclusion.

The long and well established doctrine of the law is, that all acts performed without authority are void. This applies as well to corporate bodies as to natural persons. The most simple and elementary rules hold that corporate bodies derive all of their powers from their creator, whether they be granted by the legislative, or (as in England) by the executive department of government. They are, by their charters, endowed with all of their franchises and faculties, and any attempt to exercise others is usurpation, that the law can never sanction. Natural persons are born with faculties, rights and powers, but corporate bodies possess none but such as are conferred by law, in express terms, or by clear and unmistakable implication. These rules are so elementary that it is almost inexcusable to refer to them.

If, then, this is true, how can it be said that a municipal or private corporation can enter into a valid contract which is prohibited by law, or one that is not in conformity with the requirements of the law, or where no authority is possessed to so contract? It would seem to be so clear that such a contract would be entirely void, as to require no discussion to establish its truth. It must follow, that if a contract by a corporate body is void for the want of power to make it, such a body is equally powerless to ratify it, or to perform acts that would estop it from asserting its invalidity. There must be the same *quantum* of power to ratify a void as is required to enter into a binding contract. The stream can

never rise higher than its source, and a contract void for want of power can not be ratified or the body estopped, where the power is only the same and no greater than when it was first executed. This would seem to be axiomatic; but I am fully aware that some courts of respectability have announced an opposite rule, and some text writers have followed such decisions. But I can never indorse the doctrine, and dissent to it in its entire length and breadth.

Who ever heard of its being claimed that, under the operation of the common law, a contract of a married woman, or a person *non compos mentis,* could be ratified, or they could be estopped, during the continuance of the disability? So of the contract of a minor, which may be only voidable. I presume it was never urged that such a contract could be rendered valid by a further contract, or the infant be estopped by his acts before arriving at his majority. And this is so because of the want of power to bind himself at the time of making the contract, and therefore a subsequent agreement, or the performance of acts, that otherwise would operate as an estoppel, can not produce such results. And the same must be true, to its full extent, of corporate bodies acting without power. No well founded reason or distinction can be taken. A rule that a party under disability, entering into a contract, may, during such disability, ratify it, or may so act as to become estopped, is not sanctioned by any rule, and is opposed to every well founded legal principle; nor can any rule or principle be found that can sanction it as an exception.

But if such an exception could be maintained against private corporations, what possible reason can be assigned for applying it to public corporations? They are dissimilar in the purposes of their creation and in the powers with which they are endowed. The one class is created for business purposes, and the other as aids to the government in conducting public affairs. The one is endowed with a portion of the powers of natural persons, and the other with a portion

of governmental functions.  In this consists a broad difference between the two.  If deemed necessary to make the exception against private corporations to enforce void contracts made in the course of their business, it does not, by any means, follow that the same exception should be applied against public corporate bodies.  To sanction such an exception is to abolish all distinction between rightful exercise of power and action without power by such bodies, and if carried to its logical conclusion must destroy legislative power to limit and restrict these bodies by their charters.  It would be to enable persons to procure a charter with specific franchises and powers, and to exercise all other unenumerated franchises and corporate powers.  Whilst it is desirable that contracts entered into by such bodies shall be protected and enforced, it is not desirable that all or any of the well defined principles of the law should be overturned to accomplish the purpose.

It may be that the General Assembly has authority to empower a corporation to ratify a contract made by it without power, or to declare that certain acts performed by it shall operate as an estoppel to assert the want of power; but no proposition can be plainer than that the courts have no such power, and to exercise it is to infringe upon the powers and functions of the legislative department of government.  If maintained, it will operate as judicial enactments that find no sanction in the fundamental law conferring judicial power.  The functions of the different departments must be kept distinctly separate and well defined, to avoid confusion, and to carry out the purposes of the founders of our system of government.

I, however, do not understand the main opinion to sanction or indorse this doctrine, but it refers to cases and text books that do assert it, and I feel constrained to avoid even the semblance of its indorsement, as I regard the question of more than ordinary importance.  The past generation has been prolific in creating these artificial bodies, and their

number and extent are vast, and thus this question assumes importance.

The courts have ever held that private or business corporations are artificial persons, endowed with rights that are entitled to the same protection as those of natural persons; and if natural persons, under disabilities, can not bind or estop themselves, it may be asked why corporate bodies under like disabilities should not receive like protection? This is not a question of policy, but of right. But if it were, it is not for the courts, but the legislature, to inaugurate the policy. As has been seen, a contract entered into in violation of law, or where there is no legal power, is void, and incapable of ratification, or becoming binding by estoppel, until power to ratify or become estopped shall be conferred by the legislature. But when the body has power to contract, but in doing so exceeds its power, either as to the matter, amount or time, the corporation may ratify or execute the contract to the extent of the lawful power, but may, if it choose, at any time refuse to go on in the fulfillment of the agreement, and terminate its existence. The corporation can not repudiate the portion which has been performed. The executed portion within the power must bind the parties; but not so if an unauthorized portion has not been executed,—such portion may be repudiated at pleasure.

In this case the city was authorized, by its charter, to erect lamp-posts and to light the streets, but the manner in which it should be done was not specified. This, then, left it optionary with the city to provide the means and manufacture its own gas, or to purchase it by contract, reasonable in terms and time for its performance. I apprehend it will not be questioned that the city might, under this grant of power, have contracted for gas for a month or a year. It is only denied that the city has power to contract for long periods of time, and that a period of thirty years is beyond the limits of its power. Although the contract extends through a period of thirty years, it provides for payment for all gas

furnished, each month, at its termination. The city having the power to contract by the month, it was fully within the power of the city to ratify the contract for each month the gas was supplied, and receiving and using it, as the city did, was a ratification for the time it was supplied. If the contract was void because it exceeded the period for which the city could contract, to have avoided liability for the future it should have repudiated the agreement, given notice of the fact, and refused to receive any more. This it did not do, and hence it must be held liable for all that has been received.

Inasmuch as counsel on both sides have presented and argued, as the important and controlling question of this case, the validity of the contract between the city and the gas company, I shall give some of my views on that question.

I regard it as necessary, in discussing so important a question, to refer to a few plain and generally admitted fundamental principles of our system of government. All political power rests in the people, nor can they alienate it. But in forming our constitutions of government, they delegated, but did not grant, governmental powers to the three departments: the legislative to one, the executive to another, and the judicial to a third.

The power thus delegated was a trust, and not a title. Such powers are incapable of being exercised rightfully for any other than the purposes for which they were delegated. And this power is entrusted with the understanding that it may be withdrawn, in whole or in part, at the will of the people, by amending the organic law.

In organizing our system, neither the Federal nor State government is invested with plenary and complete sovereignty, but it is divided between them, and to each is confided such portion only as was deemed necessary to attain the best government possible. The departments and functionaries of each must find authority, in their several

constitutions, to warrant their governmental acts. The theory is, that the Federal government possesses and exercises enumerated powers, expressly delegated. Its organic law specifies what acts its departments may perform. The objects of legislation by congress are enumerated, and it must look to that instrument for its power to pass laws; nor can it transcend the expressed limit, unless the power exercised be necessary to carry into effect an express grant of power. On the other hand, when the legislature of a State is invested with legislative power, it is plenary, unless prohibited by the State or Federal constitution, or the power has been delegated to congress. Hence, an act of congress to be valid must be authorized by the Federal constitution. But when an act of a State legislature is challenged as unconstitutional, the question is, whether it is prohibited by constitutional limitation. All legislative power is within the domain of a State legislature unless limited, but none is within that of congress unless it is conferred in terms or by clear and necessary implication. In this there is a broad distinction between the legislative powers of the two governments, and it grows out of the fact that before the adoption of the Federal constitution the States were endowed with all legislative power, but a portion of that power, and only a portion, was taken from the States and conferred on the Federal legislature.

The other departments of the two governments must look to the organic law for power to perform their functions, and they are largely dependent on the legislative department for enactments, to enable them to perform their functions. But each is separate, distinct and independent in its action. No officer of the general government, or its departments, can perform functions or exercise the powers belonging to a State government, nor can departments or officers of a State government exercise powers or perform duties which belong to the Federal government. The sources of their powers are different, the purposes of their organization are different, and the ends to be accomplished are

different. One set are the instrumentalities of one, and the other of another government. The officers of each may perform similar but not the same duties. They may exercise like but not the same powers. Each acts to carry out the powers of its government, but can not act for the other. So long, therefore, as the instrumentalities of each confine themselves strictly to the exercise of their own powers, without encroaching on the rights of the other, harmony between the two is absolutely certain. But the tendency of all human action, whether in the aggregate or by the individual, is for the stronger to dominate the weaker, and this is as true when applied to official or governmental as to individual action, and it remains for the future to determine whether our system of government shall form an exception to the past history of the world. If encroachments shall come, and be successfully maintained, whether by the States or the Federal government, it must prove disastrous to the government. Nor can any one safely predict from which direction it is liable to come, or whether for a time in one direction, and then react in the other, with redoubled energy. Our only safety is for each to scrupulously abstain from the exercise of all power which belongs to the other, and thus avoid all occasion for contention and strife.

It then follows, that the Federal Supreme Court has the power, and it is its duty, to give construction to the Federal constitution and laws, and it is the duty of the State court of last resort to give construction to the State constitution and laws; and when each has given such construction, it is authoritative and binding on all other tribunals. This is so of necessity, because each is acting under and performing duties for its own government. No organization deserves the name of a government which is powerless to enact, interpret and enforce its own laws. Nor can a government long maintain its authority which is compelled to submit to the construction of its constitution and laws by the tribunals of another government, and especially so when that other

tribunal is under no special obligation for its support, not even the sanction of an oath, and can be restrained only by its uncontrolled will.   Surely such was not the intention of the framers of our constitutions of government.   Such action might be adapted to provinces, but never can be to governments.

The constitution may, I think, be searched in vain for the semblance of power in the Supreme Court of the United States to review and annul a decision of a court of last resort of a State, giving construction to the State constitution or a statute of a State not in conflict with any provision of the Federal constitution.   The power has no existence in either the enumerated or unenumerated powers, and hence the congress of the United States has no authority, if it would, to confer such power. It, on the contrary, has, by the act of 1789, declared that the laws of the State shall be the rule of decision by the Federal courts, when they are applicable, except when the constitution, treaties, or statutes of congress otherwise require or provide.

Then what are the laws of a State?   Manifestly its constitution, statutes and the rules applied in the administration of justice, as construed and applied by the court of last resort in the State.   When so construed and applied they are the laws by which all persons in the State are governed, and to which they are compelled to yield obedience, and which the functionaries of the State are bound to enforce.   When the State court has decided a contract is repugnant to the State constitution, or that it violates a statute of the State, or fails to conform to its requirements, the Federal court, as has been seen, has no power or jurisdiction to review the decision and declare the contract is not repugnant to the State constitution or law, or to declare it valid and enforce its performance.   If such is its power, then the State courts must take the construction of their constitutions and laws as given by the Federal court.   This they are not required to do, and failing to do so, there must be two rules of decision in the same

jurisdiction : one for residents and the other for non-residents of the State.  If such shall be the action of the two tribunals, then a non-resident may enter into a contract forbidden by law or not in conformity to law, and sue in the Federal courts and enforce the contract, as the Federal courts, as I have already said, owe no special duty to the State constitution and laws.  It was the manifest design of the framers of the constitution that a citizen of one State suing in another should have the same and no other measure of justice than is meted to the citizens of the State in which he sues.  Any other rule would be subversive of equal justice.

There would seem not to be the slightest pretence that the obligation clause of the constitution confers the power on the Federal Supreme Court to review and revise the decisions of the State court.  Then what are the rightful powers and jurisdiction of the two courts?  Obviously it devolves on the State court to determine whether the contract contravenes the constitution or laws of the State, and if it so holds, then the contract is void, and if void it has not, nor can it have, any obligation to be impaired.  If it is held there is a valid contract, then the judicial powers of the Federal government may be invoked to protect it against any law which attempts to impair its obligation.  The State courts, beyond all dispute, had this power before the adoption of the Federal constitution, and no one, so far as I have been able to find, has ever suggested by what constitutional provision the jurisdiction has been lost.  It has been assumed, and where will this assumption end?  Who can answer?  Not the present incumbents of that tribunal, as they have no power to bind those who may succeed them.  To preserve harmony there must be a boundary between the jurisdiction of the two tribunals, and where more reasonably than that here indicated?

There is another plain, fundamental principle, that would seem to be axiomatic, which is, that departments or officers

have no power to alienate the powers of government to persons or corporations. And it is equally true that neither can, by a contract in any form, bind the government not to exercise any of its powers, nor to sell the privilege to persons or corporations to exercise governmental powers, nor to bind the government to release them from the observance of the general laws, police regulations or the penal code. All such sales, agreements and exemptions are utterly void. Such grants and agreements are contrary to the principles of all government, from the mildest to the most despotic. It is subversive of government. A stronger may wrest such powers from a weaker government, but the power can not be sold. The instrumentalities of government have no title to such power, and hence can not sell or dispose of it. Would it not be regarded as monstrous, if the chief executive or the judge of a court were to contract, with or without a consideration, with an individual or a corporate body, not to execute the laws, or not to perform the duties of their offices? Where does the legislature acquire the power to make such contracts or to sell the powers of government? To what constitutional provision or principle can it be referred?

If the mere trustees of the power may sell one portion of the essential powers of government, they may alienate all of them. This proposition would seem to be self evident. If the General Assembly may constitutionally bind itself not to exercise one of the governmental powers, it may by contract abdicate the exercise of all of its functions. If it may sell or barter away its own powers, it may the powers of the executive and judicial departments.

All writers on government agree, that the taxing power is one of the highest and most essential attributes of sovereignty, because only by its exercise can the government exist. It affords the aliment that preserves the life of the government. Without revenue the government must end. Suppose the General Assembly were to propose by enactment that all persons who should, by a specified day, pay a particular sum into the

State treasury, they and their heirs, and the property of each, should be forever exempt from taxation or any contribution to the support of government, could any one be found who would contend that it would be within the scope of legislative power? And yet, if the legislature may exempt an individual for life, or a corporate body forever, why may it not exempt all persons from the same burthens? In the very nature of government itself it can not be justly done, and there is an absolute want of power to perpetrate such wrong on the community. If so unreasonable and so unjust a doctrine must obtain, the time must come when there will be a large and privileged class wielding the capital of the country, who, whilst receiving protection to themselves and property, will, by contract, be entirely exempt from all of its burthens. They will purchase exemption by paying a trifling consideration, or persuading the legislature that some trifling service is a consideration that is an equivalent for the exemption.

It will no doubt be said that I am anticipating evils that can never occur. Let it once be understood that such exemptions will be sustained, and efforts will be made, combinations formed, and every appliance used to procure them, that must prove potent for evil.

These, and similar exemptions equally pernicious, are multiplying with great rapidity, and no one can calculate the extent it will reach within the next century, which is but a span in the life of a nation. We have no power, and if we had it would be unjust to those who come after us, to entail on them such consequences. Such a doctrine tends to the subversion of the principles of our government,—to the obliteration of some of its most essential doctrines, and if maintained, must be attended with incalculable evil. Yet the Federal Supreme Court has held, in numerous cases, that it is competent for the General Assembly to contract with a corporation never to tax its property, and not only so, but has overruled a decision of a State court holding that the exemption was repugnant to the State con-

stitution,—and in doing so resort was had to highly refined distinctions in the meaning of words. The court surely did not contemplate the consequences of such a precedent. Whether so or not, I dissent *toto cœlo* to the doctrine.

I maintain the broad doctrine, that, independent of all constitutional restrictions, the General Assembly has no power to irrevocably bind itself or its successors not to exercise the power or perform the duty of levying and collecting taxes on all property. That can be done only by constitutional requirement. All such exemptions, even temporarily, are unjust, and when permanent and without limit as to the amount, and perpetual in its continuance, must prove oppressive to the balance of the community. Is it possible that the General Assembly may put up such exemptions on the auction block, and knock them down to the highest bidder, or may, on a pretended or fictitious consideration, bind themselves and succeeding legislatures never to resume the power to impose just taxes on the property of the individual or corporate body? I am not aware that such exemptions have been made in favor of individuals, but to corporations only; but by every rule of constitutional law, individuals are entitled to the same privileges as corporate bodies.

These are questions that are not, I think, settled, nor will they ever be until the grounds on which *Dartmouth College* v. *Woodward*, 4 Wheat. 518, and cases based upon it, shall be reviewed, and the doctrine settled on true principles. Those decisions are not sound, and if the republic lasts, the time will come when correct principles must and will govern. With our rapidly increasing population, commerce and wealth, the rapid increase of corporate bodies with such exemptions, the hasty and inconsiderate legislation that makes such grants will produce evils, and impair the powers of government so that it must prove disastrous, and will demonstrate the unsoundness of those decisions, so as to compel a reconsideration of the grounds upon which they are based. Overpowering necessity will compel it, or the State governments will be

shorn of all power to afford just protection to the people. It is a monstrous heresy to hold that a legislature may create a body, and by contract place it beyond all control. The Federal court has not so held, but if its decisions are carried to their logical and consistent results, it must and will come to that. Consistency must carry the doctrine to that point, and all for the reason that the court is following a precedent, and extending and applying principles that are wholly unsound.

Can it be possible that in framing the obligation clause of the constitution, power was conferred upon State legislatures to make merchandise, and put up at auction and knock down under the legislative auctioneer's hammer the essential and sovereign power of the government? Were the framers of that clause aware of the fact that they were providing the means of subverting, not only the principles of our government, but also its form and power? Did they intend to grant the power, or is it possible to believe they imagined, that they were inventing an unheard of means by which a State could commit suicide and terminate its existence? Did they suppose that they were enabling a corrupt or weak legislative body, swayed by passion, prejudice or cupidity, to irrevocably bind the government never to exercise the taxing or law-making power on individuals or corporate bodies, however powerful or useful?

From time immemorial the power has been exercised of temporarily conferring some of the powers of government to municipal bodies; but the power to modify, amend or repeal the charters of such bodies has existed and been recognized since they were first established. This is so because they are created as aids to government,—mere instruments of the State for public convenience and utility. And in *Dartmouth College* v. *Woodward, supra,* these charters were held not to be a contract, within the meaning of the obligation clause of the constitution, and were conceded to be under legislative control, nor has the Federal Supreme Court yet held, in terms, that they are not; but if that tribunal shall adhere to the

doctrines of more modern decisions, it will be inevitably compelled to so hold, where the General Assembly shall attempt to grant power to make a contract between a municipality and a private corporation, requiring a long period of time for its performance, and the grant of such power is held constitutional by the State court. That court, to be consistent, must hold that such a grant, sanctioned by such judicial determination, must deprive the legislature of all power to repeal the charter of the municipality, however urgently demanded by public necessity, but are bound to keep it in existence, that there may be a contracting party for the benefit of a private corporation, even to the injury of the public. The wisest and most far-seeing, to their great astonishment, will then find that human foresight and sagacity were not capable of seeing or preventing having fastened upon the people local government, beyond the control of the power of the State. This, manifestly, was never intended by those who made the constitution, or the decision in *Dartmouth College* v. *Woodward, supra.*

In the power of legislative control of municipalities, there is a broad distinction from private corporate bodies. The latter are protected from legislative control in all of their franchises, in the same manner and under the same legal principles that individuals are protected in their property, and this, too, without any reference to the obligation clause, but for the same reason that persons are protected in their rights of property,—on the same principle that all are secured against invasion of their rights of persons and property.

But the principles of *Dartmouth College* v. *Woodward, supra,* I have ever regarded as unsound, and must, in the end, yield to correct principles. It will, no doubt, be said that nearly two-thirds of a century should settle the doctrine, and it should not be disturbed. Where a decision is inherently wrong, and is adhered to, and its principles extended and applied to other cases falling within its doctrines, it must produce evils that must constantly call for a review and modi-

fication of such a decision. When inherently wrong, time itself can never sanctify its doctrines.

The increased energy and quickened impetus that modern civilization has imparted to commerce, trade, manufactures and other pursuits, has vastly increased all of their appliances, and chartered incorporations have been seized upon as one of the most potent means of giving acceleration to the movement. From this cause there has been a vast multiplication of charters, for almost every conceivable object. Those who granted them, looking alone to this advance, did not consider collateral or ultimate results, but simply the means best calculated to sustain the wonderful progress that surrounded them and carried them with it. Hence charters were loosely drawn, illy considered, and hastily and improvidently adopted. By that means grants and exemptions were conceded, frequently couched in obscure language, and not properly limited. It, therefore, follows, that the salutary rule of construction should be applied, that all grants by the government should be construed liberally in its favor, and strictly against the grantee. A strained construction against the government can not be sanctioned without cutting loose from long and uniformly established doctrines of the law; and most certainly so when the departure forever deprives the government of its essential powers.

But if the charter of a private corporation must be held a contract, then there should be a distinction made that none can be protected but such as aid the government in carrying out its public policy. All should be considered *nudum pactum* but such as are of a *quasi* public character. Such are railroads that transport persons and commodities from one point to another, at cheap rates; banks that furnish currency, and facilitate commerce and trade; and a class of colleges and universities that advance knowledge, increase intelligence, and all of the attendant benefits;—and some others might be enumerated. But even in their protection it

should not be extended to grants of governmental powers, or an abdication of their exercise.

What reason can be assigned for protecting petty corporations under the obligation clause of the constitution, where they render no service to the State, promote no public interest, but simply do a business, which, had they not obtained charters, would have been accomplished as well by individual or partnership enterprise? Such petty bodies usually procure charters simply to escape individual liability for debts incurred in carrying on the business, after, in many instances, making dividends from the capital equal to the money paid in by the stockholders. Are these such bodies as should excite the solicitude of courts to strain construction to bring them under the broad and ever-extending shield of the obligation clause of the constitution? They are of no public utility, and are usually pernicious to public as well as private interests.

But, it may be said the legislature should exercise more wisdom in granting privileges and exemptions, or the people should be more prudent in electing their representatives, and they must be held to the results of their imprudence. It may be that more discretion should be used, but if so, why visit punishment on those who shall come after them, as all cessions of political or governmental power are given forever,— beyond recall even by constitutional amendment,—if the doctrine of the Federal Supreme Court shall obtain? But aside from this, all who are familiar with the history of the past, know that there are periods in the history of people and governments, when, through general and intense excitement, all, even the most intelligent, lose their equipoise, and blind passion rules the hour, and all rush to financial ruin. In illustration of this fact it is only necessary to refer to the "Mississippi Bubble," and "John Law's financial scheme." The same spirit has dictated the prodigal and pernicious grants to corporate bodies, which seem likely to entail vast and unending evils.

In view of these facts, why extend the principles of *Dartmouth College* v. *Woodward, supra,* to embrace cases that are excluded in terms or by the reasoning,—cases which those who decided the case did not intend to embrace, and no doubt supposed never would be held to be embraced in the decision or the reasoning? In view of the importance of the question I am discussing, I shall examine the rule of construction adopted in *Dartmouth College* v. *Woodward, supra.* It is the first case where the obligation clause was construed, and is the supposed basis of subsequent decisions. Few cases in this country ever excited more division and bitter contest. It was not at the time, and never has been, satisfactory to a large portion of the bar, eminent for their ability, and it is believed to be less so since it has been extended in its application to cases that were supposed to be beyond its reach. Nothing short of the luster of the name of Chief Justice MARSHALL, which has caused unquestioning assent to all of his utterances, could have given that case the force of a precedent that has not before this been overruled or essentially modified, and limited in its application to subsequent cases. And whilst his great fame was justly earned and properly bestowed, and whilst he was always great, it would not be true to say he was always accurate. And I must presume to say, that I think his construction of the obligation clause in that case is unsound.

He, after quoting the clause of the constitution that no State shall pass any law impairing the obligation of contracts, and the further clause which confers jurisdiction on the Federal courts, assumes the vital, and in fact the controlling, question in the case. He says: "It can require no argument to prove that the circumstances of this case constitute a contract." This was the question upon which the decision was made to turn, and which was in dispute. It is apparent that whilst the application to the government for the charter was pending, there was no element of a contract. When the charter was conceded and accepted, it undeniably

constituted a complete and executed grant. But, according to all received definitions of the term "contract," whether of that or the present day, it was not a contract. It, however, was a grant, with its powers and its limitations fully executed and performed by the government,—as completely so as had the government granted, issued and delivered a patent for a tract of land. It would have been as accurate to call the patent a contract as the charter. When the cession or grant was made, the government, by or in the charter, proposed or agreed to do nothing further, nor did the corporation agree to do any act for the government, the public, or any individual. There was the implied duty on the part of the government to protect the body in its rights and franchises, to the extent, and to no greater extent, than would have been the implied duty to protect an individual in the use and enjoyment of land sold or granted to him, and for which a patent had been issued, and the duty to neither would have been higher than to afford protection to any other individual in any and all of his legal rights.

On the other hand, it is held that there is an implied duty on the part of the corporation to carry out the purposes for which it was organized. But the duty arises by implication of law, and not by contract. But the duty to carry out the objects of its organization is no more a contract than are duties imposed on a natural person. Hence the grant and acceptance of such a charter can only accurately be said to be a grant, the duties being imposed by law, not by contract.

The generally accepted and technical meaning of the word "contract," is given by Blackstone, vol. 2, p. 442. He thus defines the term: "An agreement, upon sufficient consideration, to do or not to do a particular thing." This was then, as now, its legal meaning. If this be true, and its correctness will not be questioned, where are the elements, or a single element, of a contract, in the grant of a charter to a corporation? I fail to perceive any. I have said the

government does not agree, promise or covenant to perform
a single act when a corporate body receives its charter, and it
agrees to perform no act or duty. Then how can this char-
ter, or any other, in any just sense, be said to be a contract?
Not by any rule or definition of which I am aware. If, how-
ever, it be said that in construing the constitution mere tech-
nical rules or precise and accurate definitions should not
control, but the whole instrument and all of its provisions
should be considered for the purpose of learning the mean-
ing of the framers of the instrument, it may be conceded.
And yet there is another rule which requires that the words
must be interpreted in their ordinarily accepted sense, as
that instrument was written to be read and understood by the
people.

Tested by this rule, I apprehend few, if any, persons would
ever call a charter for a corporation a contract, or would
ever suppose it was, unless informed that it had been so held
by the courts. Such is not the usually accepted meaning of
the word. But be this as it may, I shall proceed to
ascertain whether under any rule the court gave to that
clause a proper construction.

Notwithstanding Chief Justice MARSHALL says that it re-
quires no argument, he does proceed to argue for the construc-
tion adopted. In speaking for the court, he limits and guards
the application of the rule even far beyond its exception of
municipal bodies. He says, it was " urged that the word ' con-
tract,' in its broadest sense, would comprehend the political
relation between the government and its citizens; would extend
to offices held under State authority and for State purposes,
and to many of those laws relating to civil institutions which
must and would be controlled by circumstances, and be modi-
fied by legislation to preserve good government, and in which
the public judgment must control; that even marriage is a
contract, and its obligation is affected by the laws respecting
divorces; that the clause in the constitution, if construed in
its greatest latitude, would prohibit these laws. Taken in its

broadest and unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a State, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with the varying circumstances; that as the framers of the constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term 'contract' must be understood in a more limited sense; that it must be understood as intended to guard against a power of at least doubtful utility, the abuse of which has been extensively felt, and to restrain the legislatures, in future, from violating the right of property; that anterior to the formation of the constitution, a course of legislation had prevailed in many, if not all, of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. To correct this mischief, by restraining the power which produced it, the State legislatures were forbidden to pass any law impairing the obligation of contracts,—that is, of contracts respecting property under which some individual could claim a right to something beneficial to himself,—and in that sense the clause in the constitution must, in·construction, receive some limitation. It may be confined, and ought to be confined, to cases of this description—to cases within the mischief it was intended to remedy.

"The general correctness of these observations can not be controverted. That the framers of the constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed, may be admitted. The provision of the constitution never has been understood to embrace other contracts than those which respect property or some object of value, and confers rights

which may be asserted in a court of justice. It has never been understood to restrict the general right of the legislature to legislate on the subject of divorces. These acts enable some tribunals, not to impair a marriage contract, but to liberate one of the parties because it has been broken by the other."

I have quoted thus liberally from this opinion because these paragraphs embody the rule, with its limitations, and the reasons for the construction given to the obligation clause, on which the decision of that case depended. But it seems to me that it is utterly impossible, by any ingenuity, to torture anything there said into a precedent that can sanction the authority of a legislature to barter away any of the essential attributes of government, and that such a grant is held to form a valid contract, and is protected by the obligation clause of the constitution. On the contrary, it is manifest that such power and protection are as clearly excluded as though the opinion had been written in a case presenting that very question. There is nothing in the opinion that can, in the slightest degree, sanction such a doctrine. But the case denies it, in principle.

I am unable to see that the reasons assigned for the construction adopted sustain the interpretation announced, even with its limitations. It is not said, nor does the history of those times inform us, that the legislature of any State had seized the franchises, property or government of any civil corporation, or the property of individuals, before the Federal constitution was adopted, but they had passed unfriendly enactments to prevent the enforcement of contracts for the payment of money, and the performance of other obligations between man and man, and it is perfectly obvious, to my mind, that such were the contracts intended to be embraced in the obligation clause of the constitution, and they are such as are referred to by the court. The facts to which the court refers do not warrant the inference that the framers of that clause had such a corporate body, or its grants of privileges

and powers, in their minds, but did have, and only had, un-performed contracts and agreements in view. Property rights, including franchises, were, no doubt, intended to be and were protected by the clause which prevents private property from being taken for public use without just compensation.

By what rule of construction can it be said that the language of that clause embraces one contract and excludes another? The clear and manifest import of the language includes all contracts. It provides for and makes no exception to any species of contracts. It says contracts, and means all contracts, and a court has no power to exclude anything embraced in the terms of a constitutional provision or a law. The canons of construction forbid it. And where a court excludes things embraced in either, because the court would not have included them, that is not construction, but is repealing or amending the provision,—is exercising legislative and not judicial functions, and no one will claim such power for a court.

The unsoundness of the decision consists in calling things contracts which are not contracts. According to no accurate definition can marriage be called a contract. It is a relation existing between the parties. That relation doubtless results from a previous contract, and so of the ownership of all property or rights enjoyed by all persons. The relation of husband and wife has no more of the elements of a contract than that of parent and child. It is a mere relation, and that relation, under the law, imposes duties, and a violation of some of those duties authorizes the termination of the relation by a sentence of a court of competent jurisdiction. If it was a contract, then to dissolve the relation under and in accordance with a statute passed authorizing its dissolution, would be to impair the obligation or binding force of the contract. Nor is it accurate to say that when the divorce is granted, if it is a contract, it does not impair the obligation of that contract, but simply releases one of the parties from

its performance. Would not all persons say, that were a law passed that provided that all payees of notes, on failing to perform certain things not required by the notes, should release the makers, it would impair the obligation of the contract? Merely calling it the releasing of one party would not change the legal effect of the provision of the law.

The plain and obvious meaning of the words of the clause embraces, and only embraces, unexecuted or unperformed agreements. How is it possible for a contract to exist when it is fully performed by both parties? When a contract has been fulfilled, the contract is then merged into a right in possession, but when it was but a contract it was but a right in expectancy or in action. When a person contracts to sell another an article of personal property, and makes delivery according to the terms of the agreement, and receives the stipulated price, would it not be a perversion of terms to say that a law affecting the title of the purchaser to the property thus purchased, impaired the obligation of any kind of contract between the parties? His right of property would be invaded, but no contract would be affected. When the charter was granted and accepted, if there ever was a contract it was as fully merged as was the contract in the supposed sale and delivery of the property. As long as there is anything to be done under an agreement, there is a contract, but when both parties have performed all things required by the agreement, then the contract is as absolutely extinguished as if it had never existed.

The Chief Justice, in all of his reasoning to show the necessity for the adoption of that clause, shows, to my mind, that the framers of that clause intended to provide for and protect unexecuted or unperformed contracts from legislative invasion. The whole difficulty grows out of bringing into the clause subjects not embraced in the language employed. If confined, as the language clearly imports, to unexecuted contracts, there never would have been the slightest difficulty in its application, or danger of its impairing the essential political

powers of the States, and crippling them in the administration of government, nor would decisions have been announced that impose unequal, and consequently unfair, burthens on the masses, and exemptions extended to the privileged few. It would carry out the manifest intention of those who framed the constitution, and would work injury to no person or class of persons. It would accord with every other provision of the constitution and the theory of our government. If it must embrace executed contracts, then how exclude limitation laws, dedications to public use, prescriptions, and others, which impair the rights of the creditor or former owner?

If a new rule of interpretation is to be adopted, that a subject is to be excluded because it would work hardship if it were embraced, then all of the provisions of the constitution and of the code of statutes are liable to be abrogated. If, because divorce laws, limitation laws, insolvent laws and prescriptions are to be excluded because they give repose and quiet to society and procure its well-being, and therefore could not have been intended to be embraced, it may be answered, that to have embraced them would not have been so disastrous to the public as to embrace a grant of the sovereign powers of the State. Would any one concede the constitutional power of congress to permanently grant away the sovereign powers of the general government? I presume no one could be found to indorse such a constitutional heresy; and if that body can not, it may be asked by what rule or principle the State legislatures may do such an act?

Believing, as I do, from past decisions of the Federal Supreme Court, that if the power of the legislature to enable a municipal corporation to enter into contracts requiring years for their fulfillment, was sanctioned as constitutional by the State tribunals, the Federal court would hold that the State had thereby bartered away its power of repealing the charter till the time should expire, I must hold the grant in this charter, or other enactment, if it can be construed to

authorize such a contract, is unconstitutional and void.  It is the duty of the officers of the State to use all constitutional means to preserve the just rights of the State unimpaired. I therefore must hold the law unconstitutional, rather than deprive the legislature of what I regard as its constitutional and inalienable right.

In view, therefore, of what I believe that court will hold, the cases of *Stevens* v. *School Directors*, 87 Ill. 225, and *Davis* v. *School Directors*, 92 id. 298, acquire peculiar force. In those cases it was held that school directors have no power to employ teachers for a longer period than till the reorganization of the school board, because if it were allowed, it would enable the old board to take the power out of the control of the new board, during the period of its existence.  If a board may employ a teacher for the next year or for ten years, just before the new board organizes, and if they may thus contract and bind their successors in reference to other matters pertaining to the school, it would deprive their successors of power the law has vested in and to be exercised by them.  It would enable an expiring board to impose on the district incompetent, inefficient and undesirable teachers, and to fasten on it unwise, unjust and oppressive contracts for long periods. It was held, each board must have power to perform all of the duties imposed on them, untrammeled by their predecessors; but in organizing a winter school, if the term should run a short period into the new school year, the rule would not necessarily apply.  Under what I believe the Federal Supreme Court will hold, no better rule can be applied to all municipal bodies.

But, independent of such a decision, there must be a limit as to what matters corporate bodies may contract, and, when the subject is within their power to contract, as to the time of its duration.  It does not follow, that because the city, by its mayor and common council, is authorized to erect lamp-posts and light the streets, it may enter into a contract with a gas company to furnish gas for a third of a century,

a century, or perpetually. In the absence of express authority for the purpose, it is reasonable to hold the city was only empowered to contract for a period not beyond the next election and organization of the new city council, leaving the new council in the control and full exercise of the power of the city government. It has been seen that the General Assembly is not competent to authorize any contract that will impair their power of repeal, and this must be the limit on the period beyond which such contracts can not extend. If it had power, the General Assembly could never have contemplated, when it authorized the city to erect lamp-posts and light the streets, that they were conferring power to contract perpetually or even for long periods of time, thus depriving the people of all advantage growing out of any new processes or improvements and competition, reducing prices, or improving the quality of light generated.

Again, this is a portion of the political power of the State held in trust by the city, and is incapable of alienation, or its exercise abdicated, or of estoppel, so as to place it beyond the power of repealing the charter by the General Assembly. As a general rule, without exception, one legislature has no power to bind a future one not to exercise political power. All contracts or grants which impair the legislative or political power, do not nor can they bind future bodies entrusted with its exercise. To sustain such contracts or grants would be to admit the power to subvert the government. Hence the grant of power to a municipality to contract for any period, can not bind the General Assembly not to repeal its charter, or if it does so bind that body, then the contract is void.

I must, therefore, hold this contract unconstitutional and void.